**E-FILED 09-30-2010**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| MEDIA LAB, INC., <br><br> Plaintiff, <br><br> v. <br><br> LAURA COLLIS dba LC INTERNET MARKETING dba LC INTERNET MARKETING, LLC dba GOINGTOCALIFORNIA.COM dba CALIFORNIA-AMUSEMENT-PARKS.COM, <br><br> Defendant. <br> _____/ | No. C08-04732 HRL <br><br> **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** <br><br> [Re: Docket No. 56] |

## BACKGROUND

Plaintiff Media Lab, Inc. (Media Lab) sues Laura Collis (Collis) for alleged cybersquatting (15 U.S.C. § 1125(d)), trademark infringement (15 U.S.C. § 1125(a)), and conversion/conspiracy to commit conversion.[1] Briefly stated, plaintiff claims that Collis conspired with Media Lab's website administrator to steal Media Lab's domain names, which Collis then used for her own benefit. All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c);

---

[1] The complaint also asserts a claim for fraud/conspiracy to commit fraud. At oral argument on the instant motion, however, Media Lab stated that if it prevailed on summary judgment, it would withdraw that claim. Accordingly, the claim for fraud/ conspiracy to commit fraud is hereby dismissed.

FED. R. CIV. P. 73. Now before the court is Media Lab's motion for summary judgment. For the reasons stated below, the motion is granted in part and denied in part.

## BACKGROUND

A.     <u>Media Lab's Business and Defendant's Alleged Misdeeds</u>

Media Lab sells discounted theme park tickets online and has been doing so since 1997. It claims that it is the rightful owner of the domain names <u>welcomemagazine.com</u>, <u>goingtocalifornia.com</u>, and <u>californiaamusementparks.com</u>. (Kirkwood Decl. ¶ 13). Plaintiff says that its revenues are derived from advertisements purchased by ticket vendors on these and other of Media Lab's websites. (Kirkwood Decl. ¶ 2). According to plaintiff, these websites have been viewed by millions of users and are vigorously marketed in plaintiff's claimed proprietary publication, "Welcome Magazine," which is distributed to hundreds of hotels, motels, inns, convention centers, apartment communities, airports, and train stations. (Kirkwood Decl. ¶¶ 1, 3).

In October 2000, Media Lab hired John Shoffner as an independent contractor to design and manage Media Lab's websites—in sum, to be Media Lab's "webmaster." (Kirkwood Decl. ¶ 5, 7; Rosenfeld Decl. ¶ 5, Ex. B at Nos. 4-6). On behalf of Media Lab, James Kirkwood (the founder and publisher of "Welcome Magazine" and the <u>welcomemagazine.com</u> website) asked Shoffner to register various domain names for Media Lab's use. (Kirkwood Decl. ¶ 6). At Shoffner's request, Kirkwood gave Shoffner access to Media Lab's website and domain registration accounts, having been told by Shoffner that such access was necessary for Shoffner to maintain Media Lab's websites. (Kirkwood Decl. ¶ 7). By virtue of his position as "webmaster," plaintiff says that Shoffner gained extensive knowledge of Media Lab's business, including its online ticket sale processes and the company's discounted pricing agreements with various theme parks and event centers. (Kirkwood Decl. ¶ 7).

Media Lab says that unbeknownst to it, Shoffner and Collis (Shoffner's friend and associate) devised and carried out a scheme to steal Media Lab's domain names (ultimately re-routing the domain names to Shoffner's and Collis' own servers), copy plaintiff's website contents, and misappropriate Media Lab's business model and customers. (Kirkwood Decl. ¶¶

2

8-9). Collis registered domain names—including goingtoca.com and goingtocalifornia.com—which plaintiff says are confusingly similar to those belonging to Media Lab. (Kirkwood Decl. ¶ 10). Collis also created websites that Media Lab claims are substantially similar to plaintiff's websites in look, feel, and purpose. (Kirkwood Decl. ¶ 11). Media Lab says that Collis generated revenue from Internet users who were looking for Media Lab's websites, but who accessed Collis' websites instead. (Rosenfeld Decl. ¶ 5 Ex. B at Nos. 38-42).

Initially believing that Shoffner alone was responsible for this misconduct (Kirkwood Decl. ¶ 12), Media Lab sued Shoffner in Los Angeles County Superior Court and obtained a $222,995.38 judgment against him. (Rosenfeld Decl. ¶ 2, Ex. A). Shoffner filed for bankruptcy, however; and, to date, Media Lab says that it has not collected a single penny of that judgment. (Rosenfeld Decl. ¶¶ 3-4).

Plaintiff says that it was not until summer 2008, during Shoffner's deposition, that it learned about Collis' involvement in the alleged scheme. The instant lawsuit followed.

In discovery, Collis failed to respond to Media Lab's Requests for Admission. Consequently, virtually all of the above-recited facts have been deemed admitted under Fed. R. Civ. P. 36(b). (*See* Docket No. 54; Rosenfeld Decl. ¶ 5, Ex. B).

B.  Procedural History

Collis has been notably absent for the majority of these proceedings. Indeed, shortly after she appeared in this matter, she stopped defending herself altogether.

Collis' default was entered in December 3, 2008 when she failed to respond to Media Lab's complaint. Coincidentally, later that same day, Collis, proceeding pro se, filed a "General Denial" in answer to the allegations of the complaint. In it, she denied that Media Lab owns the domain names at issue or any related trademarks and asserted that the "Statute of Limitations" had run. She also denied knowing Shoffner at any time before 2005; and even then, she claimed that her only business with him was to purchase the domain names in question. She further claimed that she received no financial benefit from "domains or sites run by Shoffner,"

3

1 and asserted that she "only retains ownership due to a default by Shoffner to pay for said
2 Domains." (Docket No. 11).

3 On January 29, 2009, this court granted Collis' (unopposed) motion to have the default
4 set aside.

5 At a March 24, 2009 further case management conference, and upon Collis' application,
6 the court assigned this case to the Assisted Settlement Conference Program. The court deferred
7 setting a case schedule and set a further status conference for September 15, 2009. (Docket No.
8 43). In addition, the court granted Collis' request for leave to register for e-filing.[2] In that
9 order, defendant was admonished to familiarize herself and to comply with the Federal Rules of
10 Civil Procedure, the court's Civil Local Rules, and all orders of the court. She was also advised
11 to obtain a copy of the court's Handbook for Litigants Without a Lawyer, which is available on
12 the court's website at www.cand.uscourts.gov. (Docket No. 42).

13 Soon after, on March 31, 2009, Assisted Settlement Counsel was located and appointed
14 to educate and assist Collis in her preparation for, participation in and follow-up to a settlement
15 conference. The record indicates that no one has heard from Collis since then.

16 In July 2009, the court's ADR Unit advised that Collis failed to respond to repeated
17 attempts by the court's ADR staff and Assisted Settlement Counsel to contact her. Thus,
18 although considerable time and effort had been expended in preparation for the settlement
19 conference, the court found it necessary to vacate the referral to the Assisted Settlement
20 Conference Program and to terminate the appointment of Assisted Settlement Counsel. It
21 issued an order to that effect on July 10, 2009. (Docket No. 45). In that same order, the court
22 set a July 28, 2009 case management conference and directed the parties to appear in person at
23 the conference to discuss the status of the matter. Collis was also ordered to show cause why
24 she should not be sanctioned for her failure to cooperate in these proceedings.

25 The further CMC was held as scheduled on July 28, 2009. Plaintiff advised that Collis
26 failed to cooperate in the preparation of a joint case management statement. And, although she

27

28     [2] There is no indication that Collis took any steps to register as an e-filer under the court's CM/ECF program.

4

1  was ordered to do so, Collis failed to appear at the conference. This court did not receive any
2  response from defendant as to its July 10, 2009 order to show cause. And, the court
3  subsequently issued a second order, directing Collis to appear and show cause why she should
4  not be sanctioned for her failure to participate in the court-ordered Assisted Settlement
5  Conference and to otherwise comply with other court orders. (Docket No. 52). Collis did not
6  respond to the second show cause order either. Nor did she appear at the appointed show cause
7  hearing. (Docket No. 53).

8  As noted above, material facts underlying Media Lab's claims were automatically
9  deemed admitted when Collis failed to respond to plaintiff's Requests for Admission. (Docket
10 No. 54).

11  Now before the court is Media Lab's motion for summary judgment. Although the
12 motion was duly served on Collis (*see* Docket No. 61),[3] she did not respond at all. Nor did she
13 appear for the noticed hearing. Thereafter, the court gave defendant an additional opportunity
14 to oppose the motion and to submit evidence. (Docket No. 60). Collis was advised that, if she
15 failed to do so, summary judgment, if appropriate, may be entered against her. (*Id.*). There is
16 no indication in the record that notices and orders sent to Collis' address of record have been
17 returned as undeliverable. To date, no opposition or other response to Media Lab's motion has
18 been received.

19  Media Lab's motion for summary judgment is deemed submitted. Upon consideration
20 of the moving papers, the record before this court, and arguments of counsel, this court grants
21 the motion in part and denies it in part.

## LEGAL STANDARD

23  A motion for summary judgment should be granted if there is no genuine issue of
24 material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P.
25 56(c)(2)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party

---

[3] There has been some confusion as to the contact information for Collis, who has used different addresses at different times. Nevertheless, at a case management conference, Collis confirmed the following address as her contact information: 800 Plaza Mar, Chula Vista, CA 91910.

5

bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. See FED. R. CIV. P. 56(e)(2); *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1102. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See id*. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248-49.

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex Corp*., 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. *Id*.

Although it is not the court's task to scour the record in search of a genuine issue of triable fact, *see Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996), this court has done so here; and as discussed, below, it finds none.

DISCUSSION

A.  Cybersquatting Claim (15 U.S.C. § 1125(d))

"In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), as an amendment to the Lanham Act to prohibit cybersquatting." *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005).

> [C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder.

*Id.* (quoting *DaimlerChrysler v. The Net, Inc.*, 388 F.3d 201, 204 (6th Cir. 2004)).  A cybersquatter is liable under the ACPA if she "(1) registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive mark, or is identical, confusingly similar to, or dilutive of a famous mark, (3) with a bad faith intent to profit from that mark." *Ricks v. BMEzine.com*, — F. Supp.2d —, No. 2:08-cv-01174, 2010 WL 2985795 at *19 (D. Nev., July 26, 2010) (citing 15 U.S.C. § 1125(d)(1)(A)).  *See also Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002) (same).  "A person is liable for cybersquatting only if the mark upon which the domain name allegedly infringes was 'distinctive at the time of registration of the domain name.'" *Ricks*, — F. Supp.2d —, 2010 WL 2985795 at *20.  "A court should not look beyond the domain name to consider the content of the website." *Ringcentral, Inc. v. Quimby*, — F. Supp.2d —, No. C09-02693RS, 2010 WL 1459736 at *10 (N.D. Cal., Apr. 8, 2010).  "'The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement." *Id.* (quoting *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004)).

Media Lab says that it has rights in the unregistered marks WELCOME MAGAZINE and GOING TO CALIFORNIA.  Plaintiff has presented evidence indicating that (a) it has invested hundreds of thousands of dollars, substantial time and resources in promoting the welcomemagazine.com and goingtocalifornia.com websites, as well as its "Welcome Magazine" print publication; (b) these websites are viewed by tens of thousands of customers each month; and (c) a large portion of customers who complete transactions on plaintiff's

7

1  website are repeat customers.  (Kirkwood Decl. ¶¶ 3-4).  There is no evidence in the record
2  raising a genuine issue of material fact as to plaintiff's ownership of the common law rights to a
3  distinctive mark in "WELCOME MAGAZINE" and "GOING TO CALIFORNIA."  As noted
4  above, it has been deemed admitted that Collis (a) schemed to misappropriate Media Lab's
5  domain names; (b) transferred Media Lab's domain names to herself without plaintiff's
6  knowledge or consent; (c) used the Media Lab domain names to display a carbon copy of
7  plaintiff's websites; and (d) generated revenue from her sham websites, confusing users into
8  thinking that she was associated with plaintiff.   Kirkwood Decl. ¶¶ 8-11, 15; Rosenfeld Decl.,
9  Ex. B ¶¶ 10-42).  On the record presented, this court finds no genuine issue of material fact and
10  plaintiff's motion as to this claim is granted.

B.   Trademark Infringement

Plaintiff contends that defendant has infringed its rights in the unregistered marks WELCOME MAGAZINE and GOING TO CALIFORNIA.  Section 43(a)(1) of the Lanham Act, which applies to both registered and unregistered trademarks, provides:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  "The likelihood of confusion is the central element of trademark infringement, and the issue can be recast as the determination of whether the similarity of the marks is likely to confuse customers about the source of the products."  *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (internal quotations omitted).  To evaluate the likelihood of confusion, the so-called *Sleekcraft*[4] factors provide non-exhaustive guidance. *Interstellar Starship Servs., Ltd.*, 304 F.3d at 942.  "Those factors are: (1) the similarity of the

---

[4]   *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 346 (9th Cir. 1979).

8

1  marks; (2) the relatedness or proximity of the two companies' products or services; (3) the
2  strength of the registered mark; (4) the marketing channels used; (5) the degree of care likely to
3  be exercised by the purchaser in selecting goods; (6) the accused infringers' intent in selecting
4  its mark; (7) evidence of actual confusion; and (8) the likelihood of expansion in product lines."
5  *Id*.

6  The court does not find extended analysis necessary here. As noted above, there is no
7  evidence in the record raising a genuine issue of material fact as to plaintiff's ownership of the
8  common law rights to a distinctive mark in "WELCOME MAGAZINE" and "GOING TO
9  CALIFORNIA." And, it has been deemed admitted that Collis used these marks in commerce
10  to sell theme park tickets and that she intentionally used the domain names
11  welcomemagazine.com, goingtocalifornia.com, goingtocalifornia.net, and goingtoca.com to
12  divert users seeking plaintiff's websites to her own websites. (Rosenfeld Decl. ¶ 5, Ex. B at
13  Nos. 10-42). On the record presented, this court finds no genuine issue of material fact and
14  plaintiff's motion as to this claim is granted.

15  C.     Conversion/Conspiracy to Commit Conversion

16  Plaintiff seeks summary judgment that Collis converted the domain names
17  welcomemagazine.com, goingtocalifornia.com, and californiaamusementparks.com. Under
18  California law, an internet domain name is property that can serve as the basis for a registrant's
19  conversion claim. *Kremen v. Cohen*, 337 F.3d 1024, 1029-1035 (9th Cir. 2003). "To establish
20  that tort, a plaintiff must show 'ownership or right to possession of property, wrongful
21  disposition of the property right and damages.'" *Id*. at 1029 (quoting *G.S. Rasmussen &
22  Assocs., Inc. v. Kalitta Flying Serv., Inc*., 958 F.2d 896, 906 (9th Cir. 1992)). "Conversion is a
23  strict liability tort." *Mendoza v. Rast Produce Co., Inc.*, 140 Cal. App.4th 1395, 1405, 45
24  Cal.Rptr.3d 525 (2006).

25  As noted above, it has been deemed admitted that Collis (a) schemed to misappropriate
26  Media Lab's domain names; (b) transferred Media Lab's domain names to herself without
27  plaintiff's knowledge or consent; (c) used the Media Lab domain names to display a carbon
28  copy of plaintiff's websites; and (d) generated revenue from her sham websites, confusing users

9

1  into thinking that she was associated with plaintiff. (Kirkwood Decl. ¶¶ 8-11, 15; Rosenfeld
2  Decl., Ex. B ¶¶ 10-42). On the record presented, this court finds no genuine issue of material
3  fact and plaintiff's motion as to this claim is granted.

D.   Remedies

1.   Statutory Damages

Plaintiff seeks $400,000 in statutory damages for defendant's cybersquatting of welcomemagazine.com, goingtocalifornia.com, goingtocalifornia.net and goingtoca.com. The Lanham Act provides that "[i]n a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just." 15 U.S.C. § 1117(d). As indicated by the language of the statute itself, the court has broad discretion in awarding such damages. Under the circumstances presented here, and in view of defendant's willful misconduct as to multiple domain names, the court will award plaintiff $200,000 in total statutory damages pursuant to 15 U.S.C. § 1125(d) and 15 U.S.C. § 1117(d).

2.   Actual Damages

Additionally, plaintiff requests $108,796.00 in lost profits suffered and other expenses incurred as a result of defendant's conversion and trademark infringement. Here, plaintiff contends that lost profits are an appropriate remedy for conversion. *See Mendoza*, 140 Cal. App.4th at 1405 (concluding that defendants' retention of profits supported a claim for conversion). Additionally, the Lanham Act, 15 U.S.C. § 1117(a), provides remedies—including damages, enhanced damages, profits, costs and attorney's fees—for registered and unregistered trademarks. *U-Haul Int'l, Inc. v. Jartain, Inc.*, 793 F.2d 1034, 1024 (9th Cir. 1986). Nevertheless, the court has broad discretion, "subject to the principles of equity," in awarding such damages. 15 U.S.C. § 1117(a). Media Lab's conversion and trademark infringement claims are based upon the same conduct underlying its cybersquatting claim. As discussed above, plaintiff has elected statutory damages (as opposed to actual

10

damages) for its cybersquatting claim under 15 U.S.C. § 1125(d).  Accordingly, plaintiff's request for an award of actual damages in addition to statutory damages is denied.

3. <u>Injunctive Relief</u>

Plaintiff requests that the domain names goingtocalifornia.com, goingtocalifornia.net and goingtoca.com be transferred to Media Lab.  "In any civil action involving the registration, trafficking, or use of a domain name [under section 1125(d)], a court may order the forfeiture or cancellation of the domain name or transfer of the domain name to the owner of the mark."  15 U.S.C. § 1125(d)(1)(C).  The court finds that plaintiff's request for transfer of the above-identified domain names is reasonable.  Accordingly, the request for transfer of these domain names is granted.

## ORDER

Based on the foregoing, plaintiff's motion for summary judgment is GRANTED IN PART AND DENIED IN PART AS FOLLOWS:

1. Plaintiff's motion for summary judgment as to its claims for cybersquatting, trademark infringement and conversion/conspiracy to commit conversion is granted.

2. Plaintiff is awarded $200,000 in statutory damages under 15 U.S.C. § 1125(d) and § 1117(d).

3. Plaintiff's request for actual damages is denied.

4. Defendant Laura Collis shall transfer the domain names goingtocalifornia.com, goingtocalifornia.net and goingtoca.com to plaintiff.  Further, the registrar is hereby authorized to transfer these domain names to plaintiff, at plaintiff's request and upon being provided a copy of this order, whether or not defendant has authorized the transfer.

The clerk shall enter judgment accordingly and close the file.

Dated: September 30, 2010



HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

11

1  5:08-cv-4732 Notice has been electronically mailed to:

2  Henry M. Burgoyne , III    hank@KBInternetlaw.com, ecf@KBInternetlaw.com

3  Jeffrey Michael Rosenfeld    Jeff@KBInternetlaw.com

4  Karl Stephen Kronenberger    karl@KBInternetlaw.com, ecf@KBInternetlaw.com

5  Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.

7  5:08-cv-4732 Notice mailed to:

8  Laura Collis
   800 Plaza Mar
9  Chula Vista, CA 91910

10      Pro Se Defendant